UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
PARADISE HOGAN,                )
        Individually and       )    CIVIL ACTION NO.
        on Behalf of All       )    17-10027-DPW
        Other Persons          )
        Similarly Situated     )
                               )
                Plaintiff,     )
                               )
v.                             )
                               )
THE INSTORE GROUP, LLC,        )
                               )
                Defendant.     )
```

MEMORANDUM AND ORDER
January 11, 2021

## TABLE OF CONTENTS

I. BACKGROUND................................................... 5

  A.    Factual Background ........................................ 5

    1.    InStore's Business and Its Vendor Associates .............. 5

    2.    Mr. Hogan as an InStore Vendor Associate .................. 10

  B.    Procedural Background .................................... 12

II. MOTION TO AMEND THE ORIGINAL COMPLAINT........................ 14

  A.    Standard of Review ...................................... 14

  B.    Analysis ................................................ 16

III. SUPPLEMENTAL JURISDICTION OVER THE FIRST AMENDED COMPLAINT..... 20

  A.    Standard of Review ...................................... 20

  B.    Analysis ................................................ 22

IV. MOTIONS FOR SUMMARY JUDGMENT................................. 23

  A.    Standard of Review ...................................... 23

  B.    Threshold Matters ....................................... 24

    1.    Abandoned Claims ......................................... 24

    2.    Filing the Complaint with the Attorney General ............ 25

    3.    Demonstrating Damages ..................................... 27

  C.    The Massachusetts Definition of "Employee" ................ 28

    1.    Prong One: Free from Control and Direction ................ 33

      a.    Contractual Right of Control.............................. 34

      b.    Control in Fact.......................................... 36

    2.    Prong Two: Outside the Usual Course of Business ........... 44

      a.    InStore's Course of Business............................. 46

      b.    Whether Mr. Hogan's Services Were Incidental or Necessary................................................ 50

    3.    Prong Three: Customary Engagement in an Independently Established Trade ....................................... 59

V. CLASS CERTIFICATION ......................................... 60

  A.    Standard of Review ...................................... 61

  B.    Analysis ................................................ 63

    1.    Fed. R. Civ. P. 23(a) .................................... 63

      a.    Numerosity............................................... 63

      b.    Commonality.............................................. 63

  c. Typicality................................................ 66

  d. Adequacy................................................. 67

 2. Fed. R. Civ. P. 23(b): Predominance and Superiority ........ 69

VI. CONCLUSION.................................................... 71

Paradise Hogan brought this action seeking damages for his misclassification as an independent contractor by the Defendant InStore Group, LLC ("InStore"), allegedly in disregard of his status as a statutory employee.  Mr. Hogan seeks to represent a class of similarly situated plaintiffs — "vendor associates"[1] — who have worked on behalf of InStore in Massachusetts since January 6, 2014.

Before me are (1) a motion [Dkt. No. 24] by Mr. Hogan for leave to amend his Original Complaint; (2) a motion [Dkt. No. 25] by InStore for summary judgment; (3) a motion [Dkt. No. 31] by Mr. Hogan for partial summary judgment (as to liability); and (4) a motion [Dkt. No. 29] by Mr. Hogan for class certification.

The crux of the cross-motions for summary judgment is the statutory standard under Massachusetts law for determining whether InStore vendor associates are statutory employees.  In Part I, this Memorandum lays out the evidentiary record offered by the parties and marks the procedural travel this case has taken.  In Part II, I accept the proposed First Amended Complaint as the operative pleading for this lawsuit.  In Part III, I discuss how my allowance of Mr. Hogan's motion to amend

---

[1] "Vendor," "merchandiser," "retail associate" and "vendor associate" are terms that the parties use interchangeably to identify members of the putative plaintiff class.  I will use the term "vendor associate" in this Memorandum as a consistent designator and fair description of the alleged class members.

the Original Complaint impacts the question of continued subject matter jurisdiction in this case.  After explaining in Part III that I will continue to assert supplemental jurisdiction, I address, in Part IV, the parties' cross-motions for summary judgment in light of the operative pleading, Mr. Hogan's First Amended Complaint.  Finally, in Part V, I take up the question of class certification for this litigation and solicit the parties' proposals for bringing the case to judgment on that basis.

**I. BACKGROUND**

**A.** ***Factual Background***

    1.   <u>InStore's Business and Its Vendor Associates</u>

InStore contracts with retailers and manufacturers to provide labor for certain retail services, including inventory correction, order entry, display building, audits, surveys, and rack placing.  For example, InStore might bid on a specific retail service that a retailer or manufacturer needs done, such as an audit ensuring certain products are on the shelves or providing demonstration of a product.  If InStore wins the bid, then it will contract with the client, negotiate the terms of the contract – including payment terms and expectations for the project – and advertise the specific project on its internal website, Natural Insight, to vendor associates registered with InStore.

Vendor associates are free to select the projects that they want.  InStore cannot force vendor associates to take a project.  However, InStore does at times solicit vendor associates to to do so.  Vendor associates can, and do, select as many or as few projects as they want.  Of course, vendor associates make more money through InStore by selecting more projects.

Vendor associates must perform the selected merchandising jobs for InStore's clients during certain windows of time, and some of the jobs require completion on certain dates, at certain times, or during certain lengths of time.  These dates and times are specified by InStore's clients.  Natural Insight lists some details about the assignments, including geographic location, date, pay, estimated time to complete, and type of task.  InStore's clients provide the duties and responsibilities for each project – including the instructions and directions for how the vendor associates are to perform the projects – and clients provide materials for the projects if necessary.  At times, the vendor associates transport materials to or from merchandising jobs for InStore clients.  In these instances, InStore's clients will ship the materials to InStore; InStore then ships them to the engaged vendor associate.  InStore pays the cost of shipping.

InStore's vendor associates go to clients' stores to execute the clients' listed retail projects.  There are no

6

InStore representatives at the worksites.  InStore only hears
that a vendor associate did not follow instructions if the
retailer or manufacturer informs InStore.  InStore clients
regularly communicate with InStore about problems with a vendor
associate's final performance, and they also communicate with
InStore about vendor associate's conduct during performance.

Natural Insight tracks when a vendor associate has
completed a project.[2]  To be compensated, a vendor associate logs
on to Natural Insight, selects a project, performs the project,
completes a survey report, and submits an invoice.  The survey
report involves nothing more than marking the project as
complete on Natural Insight and uploading a picture of the
completed job.

Both InStore and its clients have access to Natural
Insight.  If a vendor associate fails to submit verification and

---

[2] The parties agree that InStore uses Natural Insight to track
whether vendor associates have reported that they completed a
project.  The parties dispute the characterization of InStore's
intention in keeping track of completion.  InStore argues that
it tracks only to trigger payment, and that it does not know
whether the project has actually been completed unless a client
reports that the project was not completed.  Mr. Hogan argues
that InStore keeps track to verify for itself that the project
was completed.  I view InStore's intention in monitoring vendor
associates to be immaterial.  *See DaSilva* v. *Border Transfer of
Mass., Inc.*, 377 F. Supp. 3d 74, 94–95 (D. Mass. 2019) (*DaSilva
III*) (dismissing argument that control was not exerted by
putative employer because putative employer only acted based on
client demands).  What matters is whether InStore exercised some
level of control over vendor associates by directing and
monitoring their completion of projects.

a photograph via Natural Insight, InStore will inform him that
he can get paid if he goes back and takes a photograph of the
completed job.  Thus, a vendor associate who fails to submit a
survey on the same day that he performs a job would still get
paid so long as he eventually submits verification.[3]  InStore
does not pay vendor associates for travel time, does not
reimburse for mileage traveling to or from jobs, does not
reimburse for other expenses, does not pay for transporting
materials to or from jobs, does not provide sick leave, does not
pay taxes for the vendor associates, and does not provide any
employment benefits.

InStore provides vendor associates with a written general
policy, titled "The InStore Group Vendor Associate Dress Code
for ALL InStore Group Assignments"("the Policy").  It applies to
"all Leads, Vendor Associates, and 3rd Party Vendor Associates
(VA's)."  The Policy provides, for example, that "[p]ants should
be 'khaki' type slacks," and that "[c]aps" and "[s]horts are not
allowed."  The Policy also instructs that vendor associates

---

[3] I note that Mr. Hogan contends InStore requires vendor
associates to complete the survey on the same date that they
perform a merchandising job.  However, he does not cite any
evidence to support this statement.  The record evidence
establishes the contrary.  InStore's Chief Executive Officer
Thomas Palombo, testified in response to a deposition question
asking "[w]hat happens if [vendor associates] don't submit the
survey on the same day that they complete the visit" with a
single word: "Nothing."

should "[a]lways report to work neat, clean and well groomed, and in appropriate work attire," and "should wear a name badge at all times."  The name badge – which describes the wearer as a "Vendor Associate" in the "Merchandising Division" of "The InStore Group" – is provided by InStore for each project. InStore clients can send a vendor associate home for not abiding by the dress code Policy.  In such a case, InStore would still pay the vendor associate the agreed upon project rate once the vendor associate completed the project.  InStore would not pay for the additional time the vendor associate needed to change into attire conforming to the Policy.

The Policy also bans vendor associates from using personal electronics while working on "resets"[4] and includes specific tools that InStore vendor associates must independently bring: a pen, a digital camera or cell phone with a camera, a safety boxcutter, and a printed ISG Store Worksheet ("the Worksheet"). The cell phone with a camera is necessary to take pictures to upload on Natural Insight showing that the project is complete. InStore does not provide vendor associates with any tools, supplies, or equipment.

The Worksheet is a custom work order that tells a vendor associate what job to perform.  Worksheets are written by

---

[4] A reset occurs "when the product is taken off the shelf, washed, and put back."

InStore in conjunction with its clients and are used for all jobs.  The record is not clear about what content precisely is included in the Worksheet.  At a minimum, however, the Worksheet identifies the assignment and the steps for invoicing the job.

### 2.  Mr. Hogan as an InStore Vendor Associate

Mr. Hogan worked with InStore as a vendor associate and performed retail merchandising services for InStore in Massachusetts in 2015.  He signed InStore's "Independent Contractor Vendor & Release Form" (the "Agreement"), a twelve-month contract that automatically renewed unless notice was given a month before the end of the contract's term.  However, both InStore and its vendor associates could terminate the Agreement at any point.  The Agreement characterized Mr. Hogan as a "self-employed independent contractor" and described his duties as the provision of "in-store merchandising services to retail stores."

The Agreement provided that InStore's role was to "assist [Mr. Hogan] in marketing [his] services," to "communicat[e] information between a client and [Mr. Hogan]," and to manage Mr. Hogan's payments by "prepar[ing] and submit[ting] invoices on [Mr. Hogan's] behalf to clients."  Mr. Hogan did not pay any fee for services by InStore.  The "details" of Mr. Hogan's projects and "evaluat[ions]" of his work were to come from the InStore client.  The Agreement further provided that Mr. Hogan's

10

employment was not exclusive, that he had the right to accept or decline engagements offered by InStore, and that he could market his services through means other than InStore.  No one at InStore told Mr. Hogan that he could not work for other companies while he was performing services for InStore.  In fact, during the period of his Agreement with InStore, Mr. Hogan worked as a vendor associate for at least one InStore competitor.

Beyond the standards provided in the Policy, no one at InStore communicated any performance expectation – including any sales expectation – to Mr. Hogan.

In the period between April and September 2015, Mr. Hogan selected fewer than nine projects,[5] consisting of 32.75 reported hours of total work, for which he was paid $324.50.[6]  Even though Mr. Hogan was compensated for two jobs that he did not actually

---

[5] The parties dispute whether Mr. Hogan worked seven projects, or eight projects.  For the purposes of the motions before me, the dispute is not material.

[6] The accounting for Mr. Hogan's work is somewhat confused in the record before me.  Mr. Hogan contends that he "reported 32.75 hours of work and InStore paid him for approximately 27 hours." While InStore states that "at least one" of Mr. Hogan's submitted project entries was for training, it does not engage with the question of accounting for the unpaid hours, but instead moves on to assert that Mr. Hogan was paid for two projects that he did not actually perform.  This is a contention that Mr. Hogan does not dispute.  In any event, as discussed in Section IV.B.1.b, *infra*, the precise damages need not be resolved at the partial motion for summary judgment stage when only the legal issue of liability is being contested.

perform, no one at InStore disciplined him for failing to perform those projects.  In fact, there were no consequences from InStore.  Mr. Hogan received $12 per hour for each project he performed for InStore, except for one job.  Upon arriving at a given project, Mr. Hogan would communicate with the client manager and would occasionally receive materials from the client.

Mr. Hogan never purchased workers' compensation insurance nor general liability insurance of any kind; he never used or purchased any tools or supplies for InStore projects; he did not declare any income from his earnings from InStore projects on his 2015 tax return; and, as relevant to his claims under Mass. Gen. Laws ch. 149, he did not file a wage complaint with the Massachusetts Attorney General as directed by Mass. Gen. Laws ch. 149, § 150 before initiating this action.

### B.   *Procedural Background*

Mr. Hogan filed his Original Complaint against InStore in this Court on January 6, 2017, "individually and on behalf of himself and all other similarly situated persons."  The Original Complaint alleged six separate claims against InStore: (1) a violation of the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*; (2) violations of Mass. Gen. Laws ch. 149, §§ 148, 148B(a), 150; (3) breach of contract; (4) unjust enrichment; (5) quantum meruit; and (6) breach of the covenant

12

of good faith and fair dealing.

On November 17, 2017, after InStore answered the Original Complaint, Mr. Hogan filed a motion for leave to file a First Amended Complaint, seeking to add Karen Cherelli, a member of the putative class, as a named plaintiff.

The proposed First Amended Complaint effectively abandoned various causes of action in the Original Complaint, except those arising from alleged violations of Massachusetts wage and hour law.  Mr. Hogan mischaracterizes the proposed First Amended Complaint as "separat[ing]" his original Claim II into two claims: one, a violation of Mass. Gen. Laws ch. 149; and the other, a violation of Mass. Gen. Laws ch. 151.  The ch. 151 claim is new to this litigation.[7]

A week after Mr. Hogan moved for leave to file his First Amended Complaint, InStore filed a motion for summary judgment. It later opposed the motion to amend the Original Complaint.  On

---

[7]  InStore contests Mr. Hogan's characterization of this proposed amendment in his First Amended Complaint as separating Claim II of the Original Complaint into two claims, because Claim II of the Original Complaint only alleged violations of ch. 149. InStore is correct.  Mr. Hogan's proposed Claim I within the proposed First Amended Complaint is simply a recitation of his previous Claim II in the original Complaint.  His new Claim II as stated in the First Amended Complaint asserts for the first time a violation of ch. 151, the Massachusetts minimum wage law. Nevertheless, for purposes of the travel of this litigation to this point, the distinctions between ch. 149 and ch. 151 are immaterial.  Both turn on the definition of "employee" under Massachusetts wage and hour law.

the same day that InStore moved for summary judgment, Mr. Hogan filed a motion for partial summary judgment, seeking to establish InStore's liability under Massachusetts General Laws ch. 149, §§ 148, 148B(a), 150, and a motion for class certification.

As appears below, I will treat the First Amended Complaint as the operative pleading and will maintain supplemental jurisdiction over what is now a case in which only state claims are asserted. After concluding, as a matter of law, that InStore cannot prove Mr. Hogan's services were outside of InStore's usual course of business, I will deny InStore's motion for summary judgment and grant Mr. Hogan's cross-motion for partial summary judgment as to liability. In that posture, I take up my reasons for granting Mr. Hogan's motion for class certification and direct the parties to develop an approach and schedule for bringing this class action to final judgment.

## II. MOTION TO AMEND THE ORIGINAL COMPLAINT

### A.   *Standard of Review*

Under Rule 15 of the Federal Rules of Civil Procedure, a party may amend his complaint "as a matter of course" within 21 days after service of an answer or motion to dismiss. Fed. R. Civ. P. 15(a)(1). Following the 21-day period, a party may only amend its pleading if the opposing party consents or if the court grants leave to do so. *See* Fed. R. Civ. P. 15(a)(2).

14

Here, Mr. Hogan filed his Original Complaint on January 6, 2017.  InStore filed its answer on March 10, 2017.  Mr. Hogan's motion for leave to amend the Original Complaint was not filed until over eight months later, on November 17, 2017, and, in the absence of InStore's consent — which was not forthcoming — this requires my grant of leave.

Briefly stated, Mr. Hogan seeks to add a named plaintiff, to drop most of his claims, and to add a new cause of action. Because InStore opposed the motion, albeit after moving for summary judgment on the Original Complaint, I will at this point take up whether to grant Mr. Hogan leave to file his First Amended Complaint and treat it as the operative pleading before proceeding further in addressing motions in this case.

A court must "freely give" leave to amend when justice so requires.  Fed. R. Civ. P. 15(a)(2).  While Rule 15 "reflects a liberal amendment policy," a "district court enjoys significant latitude in deciding whether to grant leave to amend."  *ACA Fin. Guar. Corp.* v. *Advest, Inc.*, 512 F.3d 46, 55 (1st Cir. 2008). Courts may consider whether there has been "undue delay, bad faith or dilatory motive . . . , undue prejudice to the opposing party . . . [and] futility of amendment."  *Id.* at 56 (alteration in original) (quoting *Foman* v. *Davis*, 371 U.S. 178, 182 (1962)). The further the parties are along in discovery, the higher the risk of undue prejudice to the opposing party.  Particular

prejudice follows where a motion to amend requires "a re-opening
of discovery with additional costs . . . and a likely major
alteration in trial tactics and strategy."  *Steir* v. *Girl Scouts
of the USA*, 383 F.3d 7, 12 (1st Cir. 2004) (quoting *Acosta-
Mestre* v. *Hilton Int'l of P.R., Inc.*, 156 F.3d 49, 52 (1st Cir.
1998)).

Rule 20(a)(1) of the Federal Rules of Civil Procedure
provides for joinder of plaintiffs so long as "they assert any
right to relief jointly, severally, or in the alternative with
respect to or arising out of the same transaction" and "any
question of law or fact common to all plaintiffs will arise in
the action."  Fed. R. Civ. P. 20(a)(1).  Rule 21 of the Federal
Rules of Civil Procedure provides that "[o]n motion or on its
own, the court may at any time, on just terms, add or drop a
party."  Fed. R. Civ. P. 21.  As more specifically pertinent to
class actions, a district court has "wide discretion" to allow
new class representatives to be added so long as the proposed
named plaintiffs are represented by capable counsel and do not
have conflicts with the class.  *In re Pharm. Indus. Average
Wholesale Price Litig.*, 277 F.R.D. 52, 59 (D. Mass. 2011).

**B.   *Analysis***

In this case, fact discovery was scheduled to close on
October 13, 2017, with expert discovery set to be completed by

November 10, 2017. Summary judgment motions and motions for class certification were due on November 24, 2017.

On October 13, 2017, the day that fact discovery closed, Mr. Hogan filed a motion to extend the deadlines in the scheduling order.  Mr. Hogan's motion said he anticipated needing more time potentially to add *defendants*, to amend the Original Complaint based on the deposition of Thomas Palombo, InStore's Chief Executive Officer and Rule 30(b)(6) designated witness, and to receive discovery from requests that he had apparently served on InStore as late as October 10, 2017.   I denied that motion to extend on October 27, 2017.

Mr. Hogan's proposed First Amended Complaint would now add Karen Cherelli, already a member of the putative class, as a *named plaintiff*, and it would eliminate the federal question claims asserted in the Original Complaint under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, and, in conventional diversity claims under common law causes of action in Counts III-VI.  The First Amended Complaint would also expressly include a cause of action under Mass. Gen. Laws ch. 151, the Massachusetts minimum wage law.  *See supra* note 7.

Mr. Hogan's timing was problematic.  He waited until discovery had closed to seek to amend the Original Complaint, and the reason provided for adding Ms. Cherelli — that she did not retain Plaintiff's counsel until November 2017 — does little

17

to justify the belated timing.  Presumably, because Mr. Hogan
sought class certification of those similarly situated to
himself, his counsel was, at a minimum, constructively aware of
Ms. Cherelli before November 2017.

In addition to Mr. Hogan's disingenuous explanation for his
belated addition of a second named plaintiff, he misrepresents
his proposed First Amended Complaint as solely for substantive
purposes a separation of Claim II in his Original Complaint.
Instead of a simple separation of Claim II into two component
parts, Mr. Hogan has added a new claim, for a violation of a
separate state statute.  His failure to acknowledge or account
for this addition, coupled with his pretextual failure to
acknowledge lack of compliance with Mass. Gen. Laws ch. 149,
§ 150, as discussed in Section IV.B.1.a. *infra*, is, at best,
indifference to his duty of candor with the court.

Finally, Mr. Hogan seeks these amendments after discovery
has closed, notwithstanding the fact that it was clearly
apparent from my denial of his midnight motion to extend
deadlines that I was unwilling to allow more time for discovery.

With that said, none of the amendments would appear to
prejudice InStore.  Most of Mr. Hogan's claims have now been
abandoned, and the remaining claims — even though one is newly
formulated — do not appear to require additional discovery.  For
her part, Ms. Cherelli is alleged to have "held precisely the

same position" as Mr. Hogan and to have "identical" claims to

him.  Assuming these representations are accurate, it does not

appear that adding Ms. Cherelli as a named plaintiff would

require any more discovery than if she were simply to remain an

unnamed member of the putative class.  While it would be

necessary to learn something about her to determine whether she

is a properly named plaintiff, the practical reality is that –

so long as she was a vendor associate for InStore in

Massachusetts sometime after January 6, 2014 – she fits within

the terms of the proposed class.[8]  To the degree that any

discovery would be necessary, it would be no more arduous than

the discovery necessary to determine whether Ms. Cherelli is

properly a member of the class.  InStore's liability does not

---

[8] Five months after Mr. Hogan moved to amend his Original
Complaint to add Ms. Cherelli as a named plaintiff, Ms. Cherelli
filed a separate, identical action – alleging the same claims,
the same facts, the same putative class, and with the same
counsel – against InStore in Massachusetts state court.
*Cherelli* v. *InStore Grp., LLC*, No. 1881CV00556, 2018 WL 1306393
(Mass. Super. filed Feb. 26, 2018).  InStore removed the action
to federal court on April 13, 2018, *Cherelli* v. *InStore Grp.,
LLC*, No. 1:18-cv-10717-DPW (D. Mass. filed Apr. 13, 2018), where
Ms. Cherelli found herself once again assigned to this session
by operation of this court's relatedness rules.  While *Hogan* and
*Cherelli* would ordinarily be consolidated as duplicative
litigation, Ms. Cherelli crafted her complaint to evade federal
subject matter jurisdiction *ab initio* by choosing, unlike Mr.
Hogan, not to assert federal claims at the outset.  On that
basis, the parties in *Cherelli* have engaged over whether remand
to the state court is necessary.  In a separate Memorandum
issued today in the *Cherelli* matter, I dispose of *Cherelli* by
dismissing it as a matter of federal law.  *Cherelli*, slip op.,
2021 WL _____ (D. Mass. Jan. 8, 2021).

change based on whether Ms. Cherelli is a named plaintiff or
simply a class member.  Thus, I will grant the motion to amend
despite its timing infirmities.[9]

### III. SUPPLEMENTAL JURISDICTION OVER THE FIRST AMENDED COMPLAINT

Although not addressed by the parties, the question arises
– in light of the newly operative pleading – whether I have
jurisdiction over the state law claims before me.  In his
Original Complaint, Mr. Hogan alleged a violation of the FLSA,
29 U.S.C. §§ 201 *et seq.*, which unquestionably provided this
Court with original jurisdiction over that federal claim and
supplemental jurisdiction over the related state law claims.
*See* 28 U.S.C. § 1367(a).  However, since Mr. Hogan has abandoned
his claim under the FLSA in his First Amended Complaint, I now
must determine whether I should continue to exercise
supplemental jurisdiction over the remaining Massachusetts state
law claims asserted.

### A.   *Standard of Review*

Dismissal of a plaintiff's federal claims does not
automatically divest a federal court of jurisdiction.  Under 28
U.S.C. § 1367(c), the matter is discretionary: a "district

---

[9] I evaluate the remaining motions before me in light of the
First Amended Complaint and with the understanding that both Mr.
Hogan and Ms. Cherelli are now named Plaintiffs.  Since there
has been no discovery regarding Ms. Cherelli, however, I refer
to Mr. Hogan specifically when discussing facts relevant to the
Plaintiffs.

court[] *may* decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c) (emphasis added). Thus, "the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion." *Roche* v. *John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256–57 (1st Cir. 1996) (citing 28 U.S.C. § 1367(c)(3)).

The First Circuit has instructed that "it is an abuse of discretion" for a district court to exercise supplemental jurisdiction "unless doing so would serve 'the interests of fairness, judicial economy, convenience, and comity.'" *Wilber* v. *Curtis*, 872 F.3d 15, 23 (1st Cir. 2017) (quoting *Desjardins* v. *Willard*, 777 F.3d 43, 45 (1st Cir. 2015)). The First Circuit has also observed that it would be an abuse of discretion to retain jurisdiction over a pendent state law claim "when that state law claim presents a substantial question of state law that is better addressed by the state courts." *Id.*

For example, in *Roche*, the First Circuit affirmed a decision of a district court to retain state law claims after the federal claims had been dismissed. *Roche*, 81 F.3d at 256–57. The Court of Appeals found that the district court had properly considered those state law claims despite the dismissal

of the federal claims supporting jurisdiction, because:

> The litigation had matured well beyond its nascent
> stages, discovery had closed, the summary judgment
> record was complete, the federal and state claims were
> interconnected, and powerful interests in both
> judicial economy and fairness tugged in favor of
> retaining jurisdiction.

*Id.* at 257.  Within this rubric, the district court's approach

must be "pragmatic," and "each case must be gauged on its own

facts."  *Id.*  Moreover, it is not uncommon for a federal court

to retain jurisdiction over state-law claims despite the "early

demise of all foundational federal claims."  *Rodriguez* v. *Doral*

*Mortg. Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995).

## B.  *Analysis*

This case is analogous to *Roche*.  Mr. Hogan filed his

Original Complaint in federal court on January 6, 2017 – nearly

four years ago.  Cross-motions for summary judgment have been

fully, and extensively, briefed.  Discovery was completed three

years ago.  Moreover, the case has grown more complex with the

sprouting of an identical complaint in a later-filed case by Ms.

Cherelli in state court now removed to federal court.  Because

Mr. Hogan's Original Complaint was first filed in federal court,

if I were to decline supplemental jurisdiction, the litigation

would begin anew before a more substantially burdened

Massachusetts state court.  The issue of employee classification

raised by the dispositive motions at hand, however, may be

readily addressed by me; indeed, the issue "form[ed] part of the same case or controversy" as did Mr. Hogan's abandoned federal claims and does not present a substantial question of state law that would necessarily require state court forum for adjudication.  28 U.S.C. § 1367(a).

In the exercise of my discretion, I find that it serves the interests of judicial economy and the convenience of the parties for me to exercise supplemental jurisdiction.

I will proceed to consider in the following Part the merits of the parties' respective positions regarding the definition of "employee" under Massachusetts wage and hour law — and by implication the unaddressed question relevant to whether an amendment to the Original Complaint should be permitted when it would in any event be futile.  As my grant of Plaintiff's motion for partial summary judgment makes clear, I do not find the amendment futile.

**IV. MOTIONS FOR SUMMARY JUDGMENT**

**A.   *Standard of Review***

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case."  *Sensing* v. *Outback*

*Steakhouse of Fla., LLC*, 575 F.3d 145, 152 (1st Cir. 2009)

(quoting *Calero-Cerezo* v. *U.S. Dep't of Justice*, 355 F.3d 6, 19

(1st Cir. 2004)).

The moving party bears the burden of showing "an absence of

evidence to support the nonmoving party's case." *Celotex Corp.*

v. *Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has

met its burden, the non-moving party "must set forth specific

facts showing that there is a genuine issue for trial."

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)

(quoting Fed. R. Civ. P. 56(e)).

I view the evidence in the light most favorable to the

nonmoving party and construe all reasonable inferences in that

party's favor.  *See Rochester Ford Sales, Inc.* v. *Ford Motor*

*Co.*, 287 F.3d 32, 38 (1st Cir. 2002).  When, as here, I am

presented with cross-motions for summary judgment, I must

"consider each motion separately, drawing all inferences in

favor of each non-moving party in turn." *Green Mtn. Realty*

*Corp.* v. *Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *D & H*

*Therapy Assocs., LLC* v. *Bos. Mut. Life Ins. Co.*, 640 F.3d 27, 34

(1st Cir. 2011)).

**B.   *Threshold Matters***

<u>1.   Abandoned Claims</u>

InStore moved for summary judgment on the Original

Complaint filed by Mr. Hogan, explicitly requesting that I grant

the motion as to the claims that Mr. Hogan has abandoned.  Since
I will grant the motion to amend the Original Complaint, I
discuss in this Section only the reasons that I will decline to
grant summary judgment to InStore based on the proposed First
Amended Complaint without addressing the claims in Mr. Hogan's
Original Complaint that he has chosen to abandon.

### 2.   Filing the Complaint with the Attorney General

InStore argues that because Mr. Hogan failed to file the
complaint with the Attorney General before commencing this
action, I should grant its motion for summary judgment.[10]  Ch.
149 provides:

> An employee claiming to be aggrieved by a violation of
> section[] . . . 148B [of Chapter 149] . . . may, 90 days
> *after the filing of a complaint with the attorney
> general*, . . . institute and prosecute in his own name
> and on his own behalf, or for himself and for others
> similarly situated, a civil action for injunctive
> relief, for any damages incurred, and for any lost wages
> and other benefits.

---

[10]  InStore observes that Mr. Hogan's Original Complaint
misrepresented that he had already complied with Mass. Gen. Laws
ch. 149, § 150 and filed a "Non-Payment of Wages and Workplace
Complaint Form" with the Massachusetts Office of the Attorney
General.  Apparently no such complaint was filed with the
Attorney General until September 2017, and Mr. Hogan does not
dispute the fact he did not file a complaint with the Attorney
General before commencing the current action with his Original
Complaint.  Mr. Hogan never addresses the reason for this
apparently false assertion, and, in fact, he again asserts,
without evidence, in his First Amended Complaint that "prior
[sic] initiating this litigation," he filed a complaint for both
Ms. Cherelli and himself with the Massachusetts Attorney
General.

Mass. Gen. Laws ch. 149, § 150 (emphasis added).  The procedural requirements under § 150 apply to claims brought under ch. 151, § 1 as well because ch. 151 is "predicated on [the plaintiff's] claim of misclassification under [ch.] 149, § 148B." *Depianti* v. *Jan-Pro Franchising Int'l, Inc.*, 990 N.E.2d 1054, 1060 n.10 (Mass. 2013).

The language of the statute seems to require that, before filing a civil action under the Massachusetts independent contractor statute, an individual must first submit the complaint to the Massachusetts Attorney General and then wait 90 days before commencing suit.  However, the Supreme Judicial Court has held that failure to follow this requirement does not deprive a court of jurisdiction to consider claims under Mass. Gen. Laws ch. 149, §§ 148, 148B(a), and 150, so long as "the Attorney General is notified of the suit during its pendency." *Depianti*, 990 N.E.2d at 1062.

Mr. Hogan finally got around to submitting a complaint to the Attorney General on September 29, 2017, some 51 days before asking leave to substitute his First Amended Complaint.  That filing with the Attorney General was sufficient to comply with the Supreme Judicial Court's interpretation of this statutory predicate for a private action under Massachusetts wage and hour law.  The belated submission of the Original Complaint to the Attorney General provides no reason to dismiss Mr. Hogan's

lawsuit at this point.

    3.   Demonstrating Damages

    InStore claims that damages are "an essential element" of
Mr. Hogan's contentions under the Massachusetts wage and hour
law and seeks summary judgment on the basis that Mr. Hogan has
produced no evidence of any damages.

    InStore cites *Somers* v. *Converged Access, Inc.* for the
proposition that plaintiffs bringing wage claims under
Massachusetts state law must prove damages.  But *Somers* was
clear that "a legislative purpose behind the independent
contractor statute is to protect employees from being deprived
of the benefits enjoyed by employees through their
misclassification."  911 N.E.2d at 749.  Under the Massachusetts
statute, employers cannot find a "safe harbor" in the
contention, for example, that they would have paid an employee
less had they been aware that an individual was not an
independent contractor.  *Id.*

    The Supreme Judicial Court has sought to ensure that
employers do not enjoy a "windfall" by misclassifying employees
as independent contractors.  *Id*.  If Mr. Hogan is properly
classifiable as an "employee," he

        will be entitled under [Gen. Laws] c. 149, § 150, to
        "damages incurred," including treble damages for "any
        lost wages and other benefits."  The "damages incurred"
        will include any wages and benefits the plaintiff proves
        he was denied because of his misclassification as an

> independent contractor, including the holiday pay, vacation pay, and other benefits that he would have been entitled to as a[n] . . . employee.

*Id.* at 751; *see also Awuah* v. *Coverall N. Am., Inc.*, 740 F. Supp. 2d 240, 242 (D. Mass. 2010) (rejecting putative employer's argument that plaintiff "cannot prove any statutory wage damages because it is undisputed that he received at least the minimum wage, never worked overtime, and never submitted a workers' compensation claim").

To the extent InStore argues that Mr. Hogan would ultimately have to prove damages to be entitled to recovery, I do not disagree. However, damages are not an element of the statutory scheme for liability. Rather, "section 148B is a strict liability statute and a plaintiff need not be exploited to seek recovery under it." *Beck* v. *Mass. Bay Techs., Inc.*, No. CV 16-10759-MBB, 2017 WL 4898322, at *7 (D. Mass. Sept. 6, 2017). Violation of the liability provisions of the statute are sufficient; trial on the issue of damages raises separate issues.

## C.   *The Massachusetts Definition of "Employee"*

Mass. Gen. Laws ch. 149 § 148B(a) "establishes a standard to determine whether an individual performing services for another shall be deemed an employee or an independent contractor for purposes of [Massachusetts] wage statutes." *Chambers* v. *RDI Logistics, Inc.*, 65 N.E.3d 1, 7 (Mass. 2016) (quoting *Somers*,

911 N.E.2d at 747).  The statute provides that "an individual

performing any service . . . *shall* be considered to be an

employee under [chapters 149 and 151] *unless*" all three

following requirements are met:

> (1) the individual is free from control and direction
> in connection with the performance of the service,
> both under his contract for the performance of service
> and in fact; and
> (2) the service is performed outside the usual course
> of the business of the employer; and,
> (3) the individual is customarily engaged in an
> independently established trade, occupation,
> profession or business of the same nature as that
> involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B(a) (emphasis added).

Consideration of the status of a person performing services

begins with recognition that, under the requirements of §

148B(a), Massachusetts law effectively "presumes that 'an

individual performing any service' is an employee and therefore

is entitled to the benefits of the Massachusetts wage and

overtime laws."  *Ruggiero* v. *Am. United Life Ins. Co.*, 137 F.

Supp. 3d 104, 112 (D. Mass. 2015) (quoting *Depianti,* 990 N.E.2d

at 1066).  In other words, if the employer "does not prove all

three prongs, the individual must be classified as an employee."

*Id.*[11]  "Whether the defendant has carried its burden under §

---

[11] Although Mass. Gen. Laws ch. 149, § 148B(a) by its own terms
undertakes to define who, among those providing services, is an
"employee," it is often referred to as the "independent
contractor statute," apparently because one who is not an
employee and provides services would be deemed an independent

148B(a) — on facts that are undisputed — is a question of law."
*Id.* at 113.

The Supreme Judicial Court has observed that

A legislative purpose behind the independent contractor statute is to protect employees from being deprived of the benefits enjoyed by employees through their misclassification as independent contractors.

*Somers,* 911 N.E.2d at 749.  The Massachusetts Attorney General, in providing interpretive guidance, has cautioned that "no prong should be read so broadly as to render the other factors of the test superfluous."  An Advisory Memorandum from the Attorney General's Fair Labor Division on M.G.L. c. 149, § 148B, 2008/1, at 6 ("Att'y Gen. Advisory").[12]

It bears noting that under the FLSA, and the law of many other states, "the relationship between the service performed and the usual course of the enterprise's business is simply one among many factors to be considered."  *Schwann* v. *FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 438 (1st Cir. 2016).  The Massachusetts statute's "usual course of business" prong is "something of an anomaly" because that prong dictates that "any

_____

contractor outside the protection of Massachusetts wage and hour law.

[12] Because the Attorney General is charged with enforcing Massachusetts wage and hour laws, courts must accord substantial deference, "at least where it is not inconsistent with the plain language of the statutory provisions."  *Sebago* v. *Bos. Cab Dispatch, Inc.*, 28 N.E.3d 1139, 1149–50 (Mass. 2015) (quoting *Smith* v. *Winter Place LLC*, 851 N.E.2d 417, 421 (Mass. 2006)).

person who performs a service within the usual course of the enterprise's business [is] an employee for state wage law purposes." *Id.*

Mr. Hogan also now claims – dependent on his being an employee under § 148B(a) – that InStore failed to pay him a minimum wage, in violation of Mass. Gen. Laws ch. 151, § 1. Chapter 151 requires employers to ensure that, no matter how employees are paid, they receive at least the minimum wage. *See* Mass. Gen. Laws ch. 151, § 1.  To meet this objective, chapter 151 requires employers to track each employee's hours to ensure compliance with the minimum wage law, *id.* § 15, and to provide employees time-and-a-half for any hours worked beyond a forty-hour work week, *id.* § 1A.  The viability of Mr. Hogan's substantive claim under chapter 151 turns on his claim of misclassification under section 148B(a).  *See* Mass. Gen. Laws ch. 149, § 148B(a); *see also* note 10, *supra.*

With this overview, I now address each of the arguments that InStore mounted against the ch. 149 claim — and, *mutatis mutandis*, to the named plaintiffs' claims under ch. 151.[13]

---

[13]  Neither party has directly briefed Mass. Gen. Laws ch. 151 – which was added to this action in the Plaintiffs' First Amended Complaint – in addressing the cross-motions for summary judgment before me.  However, further briefing is unnecessary because § 148B(a) "determines the viability of plaintiffs' substantive claims brought under chapters 149 and 151." *Chebotnikov* v. *LimoLink, Inc.*, No. 14-CV-13475-FDS, 2017 WL 2888713, at *7 (D. Mass. July 6, 2017).  If InStore prevails on its argument that

In Massachusetts, whether an individual providing services is to be classified not as a statutory employee but rather as an independent contractor is governed by Mass. Gen. Laws ch. 149 § 148B(a).  *See Somers*, 911 N.E.2d at 739.  Under this provision, employees are afforded the protection of wage and hour laws, but independent contractors are not.  *See Sebago* v. *Bos. Cab Dispatch, Inc.*, 28 N.E.3d 1139, 1146 (Mass. 2015).

Under § 148B(a), the plaintiff will be considered an employee and alternatively not be deemed an independent contractor unless the employer proves all three of the following factors:

> (1) the individual is free from control and direction in connection with the performance of the service both under his contract for the performance of service and in fact; and
> (2) the service is performed outside the usual course of the business of the employer; and,
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed

Mass. Gen. Laws ch. 149 § 148B(a).  It bears emphasizing that this test is conjunctive; failure to meet any one of the three prongs precludes a finding of independent contractor status and

---

Mr. Hogan is an independent contractor, it "must necessarily prevail" against Plaintiffs' arguments under chapter 151 as well.  *Ruggiero* v. *Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 111 (D. Mass. 2015).  By the same token, if Mr. Hogan prevails on the argument that vendor associates are properly classified as employees, then his ch. 151 claim may proceed as well.

results in a finding that the person providing services is a statutory employee.

There is "no question that the independent contractor statute is a remedial statute." *Monell* v. *Bos. Pads, LLC*, 31 N.E.3d 60, 67 (Mass. 2015).  As a remedial statute, it is construed broadly to "promote the accomplishment of its beneficent design."  *Id.* (quoting *Case of Sellers*, 898 N.E.2d 494, 499 (Mass. 2008)).  The bar set for employers to prove that workers are independent contractors is quite demanding.

### 1.   Prong One: Free from Control and Direction

The first prong requires that the putative employer demonstrate that vendor associates, like Mr. Hogan, were "free from control and direction . . . *both* under [their] contract[s] for the performance of service *and* in fact."  Mass. Gen. Laws ch. 149 § 148B(a) (emphasis added).  The inquiry generally turns on whether the "worker's activities and duties [were] actually . . . carried out with minimal instruction," using their own methods, except as to the result of their labor.  *Sebago*, 28 N.E.3d at 1149 (alteration in original) (quoting Att'y Gen. Advisory).  The first prong itself "contains a conjunctive test under which [Mr. Hogan] need only prevail on one branch" — either as a matter of contract or as a matter of fact.  *DaSilva* v. *Border Transfer of MA, Inc.*, 296 F. Supp.3d 389, 400 (D. Mass. 2017) (*DaSilva II*).

Minimal instruction does not require "that a worker be entirely 'free from direction and control from outside forces.'" *Athol Daily News* v. *Bd. of Rev. of the Div. of Emp't and Training*, 786 N.E.2d 365, 371 (Mass. 2003).  Rather, the question "has always been" whether the worker has "the right to control the details of the performance," *id.*, and in this connection, evaluation is necessary regarding "freedom from supervision 'not only as to the result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work,'" *id.* (quoting *Maniscalco* v. *Dir. of the Div. of Emp't Sec.*, 97 N.E.2d 639, 640 (Mass. 1951)).

I begin by construing InStore's contractual right to control the performance of its vendor associates and, then consider the level of control it exerted in fact as disclosed in the record before me.

   a.   *Contractual Right of Control*

InStore argues that the Agreement signed between the parties clearly provides that Mr. Hogan and other vendor associates are independent contractors.[14]

---

[14] Mr. Hogan contends that InStore "retained the right to control" the services of retail associates through its internal Policy.  However, since this Policy is neither a signed contract nor integrated by reference into the Agreement, I consider it under my analysis of Control in Fact.

The Agreement – titled the "Independent Contractor Vendor Agreement & Release Form" – provided that Mr. Hogan was a "self-employed independent contractor." The Agreement further provided that Mr. Hogan "underst[ood] that all details concerning a client engagement are specified by the client (not The InStore Group, LLC.), that the services [Mr. Hogan] perform[s] are evaluated by the client (not The InStore Group, LLC.) and that The InStore Group, LLC.'s involvement in a project is limited exclusively to communicating information between a client and [Mr. Hogan]." Finally, the Agreement is "nonexclusive," and provides that Mr. Hogan "always [has] the right to market [his] services through means other than The InStore Group, LLC."

That Mr. Hogan signed an Agreement classifying him as an independent contractor does not dictate the outcome of my legal analysis. *See Ruggiero*, 137 F. Supp. 3d at 114 (looking past the face of the contract to "the actual relationship between the parties"). "[M]isclassification does not turn on how the parties contractually label their relationship." *DaSilva* v. *Border Transfer of MA, Inc.*, 377 F. Supp. 3d 74, 94 (D. Mass. 2019) (*DaSilva III*).

In the final analysis, interpretation of the Agreement's terms does not, as a matter of law, resolve the question of

control.  Further analysis of control as a matter of fact is necessary.

        b.   *Control in Fact*

Mr. Hogan argues that InStore exerted control in fact over its vendor associates through its general Policy, titled "The InStore Group Vendor Associate Dress Code for ALL InStore Group Assignments."  Mr. Hogan points to the portions of the Policy relating to (1) a dress code,[15] (2) a ban on the use of electronics during "reset" projects, (3) a name tag, and (4) a list of required tools.  Mr. Hogan also argues that InStore exerted control over vendor associates by (5) mandating projects be completed within specific blocks of time, (6) providing instructions for performing each assignment in an ISG Worksheet, and (7) requiring the submission of a performance survey and photograph.

In turn, InStore argues that it is not responsible for the Policy (1, 2, 3, 4), but merely collected the preferences of its clients into one simplified guide.  InStore argues that it did not effectively (5) mandate vendor associates complete projects within specific times, because vendor associates were free to

---

[15] InStore argues that Mr. Hogan has abandoned his argument that InStore's dress code Policy exerted actual control over the vendor associates.  InStore cites no basis to support this assertion, and I see no reason to exclude Mr. Hogan's arguments as they relate to the Policy.

choose the projects they wanted to complete.  InStore also disputes that the Worksheets (6) provided instructions on how to complete the projects.  InStore does not dispute that vendor associates were required to (7) submit a final certification and photograph demonstrating completion of the job.

The Policy states that, among other things, T-shirts, denim pants, shorts, open toe shoes, and caps are "not allowed."  The dress code further states that vendor associates should "[a]lways report to work . . . in appropriate work attire." Included in the project materials that vendor associates receive for each assignment is a name badge, which the Policy instructs "should [be worn] . . . at all times."  The name tag identifies a vendor associate as a "Vendor Associate" in the "Merchandising Division" of "The InStore Group."  Additionally, the Policy indicates that "no" personal electronics "are allowed on the sales floor . . . [and] may be used only during break times." Finally, the Policy specifies tools that vendor associates "need[] for ALL ISG Assignments," including a printed InStore Worksheet, a pen, a safety box cutter, and a digital camera or cellphone.  The Policy notes that "[i]t is important that [vendor associates] follow these instructions for a successful assignment and to avoid payment delays."  InStore provided this Policy to all its staff and independent contractors.

Beginning with the Policy, InStore assigns the specific level of control regarding the dress code, required name tag, and ban on personal electronics to its contracts with clients, not to its own direct control of the vendor associates. InStore contends that its clients – not InStore – have asserted the preferences described in the Policy. InStore argues that it merely "collected dress code recommendations from [its] clients" to avoid providing vendor associates a "phonebook" of regulations specific to each client. The case law however is clear that why InStore "controls its [vendor associates] . . . is irrelevant to the inquiry under Prong A." *DaSilva III*, 377 F. Supp. 3d at 94. *See supra* note 2. Regardless of why, the Policy was compiled and authored by InStore. In so doing, InStore issued a company policy purporting to bind "all Team Leads, Regular Vendor Associates, and 3rd Party Vendor Associates."

InStore next argues that it did not enforce the Policy provisions. InStore contends that the Policy was merely a "recommendation," and that InStore had no authority to enforce it. This argument is unavailing as well. As an initial matter, it is the "[r]ight [to] control rather than the exercise of it" that is legally determinative. *Rainbow Dev., LLC* v. *Mass. Dep't of Indus. Accidents*, No. SUCV2005-00435, 2005 WL 3543770, at *3 (Mass. Super. Nov. 17, 2005) (quoting *Case of Dermott*, 186 N.E.

38

231, 233 (Mass. 1933)).  The logic of that approach is coherent: simply because an employer asserts in hindsight that a policy was never applied does not mean that the policy did not influence the behavior of workers governed by that policy. InStore's Policy expressly applied to all vendor associates, and the record does not reflect that any of the vendor associates would have reason to believe that it did not apply to them.  *Cf. Carey* v. *Gatehouse Media Mass. I, Inc.*, 94 N.E.3d 420, 426 n.12 (Mass. App. 2018) (rejecting the putative employer's assertion "that there was no evidence it had actually imposed [penalty] charges" provided by the written agreement with its workers as "immaterial for summary judgment purposes").  Under InStore's approach, putative employers could establish any number of internal guidelines and policies purporting to restrict their workers' conduct, but *sub silentio* abstain from aggressively enforcing such policies, to avoid classifying their workers as employees, no matter the effect that the policies had in practice on their workers.

I decline to conflate the lack of InStore supervisory presence at client locations with a lack of enforcement of the Policy.  If, as InStore admits, InStore clients can point to the Policy and demand compliance from vendor associates, then InStore's Policy is enforceable and being enforced.  This is so, even if InStore is not the direct voice of enforcement.  *See*

*Rainbow Dev.*, 2005 WL 3543770, at *3 (dismissing defendant's argument that "because all of the work performed is done off-site, there is no control over the performance of the worker"). Moreover, InStore admits that clients could call InStore to mediate complaints regarding compliance with the Policy.  Mr. Palombo, InStore's Chief Executive Officer, testified that if vendor associates used their phones during projects, clients could and "would just call [InStore] and tell [InStore] . . . please don't do that anymore," and InStore would relay the client complaint to InStore's "operations" arm.  However, InStore does not impose any punishments on vendor associates for client complaints.[16]

---

[16] Mr. Palombo testified as follows:

Q. [What if a vendor associate] were using their iPod?
A. On reset, . . . [the clients] want people working. They don't want people sitting around, going outside, to dilly – because you're working – you may be working in an aisle with five or six other vendors, and if you're not there, then you're not – that vendor's work is sitting – holding – may be holding someone else up, so that's why retailers require staying off the phone, guys. They give them the cigarette break, go do your thing, whatever, but when it's work time, they want people in the store performing the assignment on a reset; especially reset.  All other times there is no policy.
Q. That would be bad for InStore Group's business, right?
A. They would just call us and tell – tell – please don't do that anymore.
Q. What would you do once they did that?
A. I would say, hey, guys, you know, if – please be careful on the phone.  I would tell operations, listen, I talked to – I talked to Winn-Dixie, and they said, you know, try to use

InStore concedes that its Policy was enforceable by clients.  If a client sent a vendor associate home to change, the vendor associate was not paid for the time the vendor associate spent changing into attire in compliance with the Policy.  That the Policy was enforceable, and indeed enforced, by InStore is evidenced by the fact that, in other circumstances, InStore compensated vendor associates when InStore determined that a client had caused a delay in the vendor associate's completion of a project.  Notably, this compensation did not extend to circumstances where clients caused a delay by enforcing the Policy.

I conclude that InStore evidenced the exercise of control over its vendor associates through its Policy requirements of (1) a dress code; (2) a ban on vendor associates' use of personal technology during jobs; and (3) its requirement that a name tag be worn.

Turning to (4), the list of required tools in the Policy, InStore disputes that vendor associates were required to bring anything more than a camera.  The InStore Policy states that a box cutter and a printed Worksheet are required tools.  However, the Worksheet could be accessed online, and the box cutter may

_____

the cell phones on break.  That's all.  It's not – it's not like you're going to get thrown out of – you're not going to – we're not going to lose an account over it.

not be needed for specific types of projects, and, if needed, could potentially be retrieved from the client on site if the vendor associate came without one.  On this record, I find the question whether these "tool" requirements evidence control to be a disputed issue of material fact.

With respect to Mr. Hogan's argument that InStore (5) controlled his hours by requiring that vendor associates complete various merchandising projects on certain dates, at certain times, or during certain lengths of time, I find that this argument fails simply because it is undisputed vendor associates had the power to select which and how many projects they would undertake.  This power residing with the vendor associates included the power to select the projects according to the blocks of time predetermined for their completion. InStore did not assert control over Mr. Hogan by communicating these project specifications.  The vendor associates were free to control what project, and, hence, what project specifications they would perform.

InStore disputes that it (6) provided instructions for completing assignments in the ISG Worksheet.  InStore concedes that it writes the Worksheets in conjunction with its clients but contends that the worksheets "are separate and apart from instructions for each project."  Rather, InStore argues, the Worksheets merely indicate the "assignment and . . . how [the

42

vendor associate] can invoice [InStore]." I find that in this respect there is a genuine issue of material fact whether Worksheets providing instructions on how to perform the jobs evidence control.

Finally, InStore does not dispute that vendor associates were required to (7) submit a final certification and photograph demonstrating completion of the job.

In sum, there remain issues of material fact on the record before me whether (4) the box cutter and a printed Worksheet were required tools, and whether (6) the Worksheets provided instructions controlling the performance of vendor associates. At the same time, on this record, I have found as a matter of law that (5) InStore did not assert control over vendor associates by listing projects with date parameters for completion.

With respect to portions (1), (2), and (3) of the Policy, I have indicated in the past that incidents of workplace direction such as a uniform to be worn by a worker "standing alone, is not enough to impinge significantly on [a worker's] control of his operations." *Ruggiero*, 137 F. Supp. 3d at 116. I am similarly not satisfied that (7) submission of a perfunctory check-box

survey and photo of completed performance[17] does much work to aid Mr. Hogan's case.

Drawing the several findings from the summary judgment motion before me together, I conclude that whether vendor associates were free from InStore's control cannot be determined on this record as a matter of law.[18]

### 2.  Prong Two: Outside the Usual Course of Business

The critical point in the parties' dispute concerns Prong Two, which asks whether "the service is performed outside the usual course of the business of the employer."  Mass. Gen. Laws ch. 149 § 148B(a).  When determining whether the services performed by InStore vendor associates are outside the usual course of InStore's business, the Supreme Judicial Court has evaluated two factors: (A) what is the usual course of business of the employer, and (B) what are the services performed by the worker.  *See Sebago*, 28 N.E.3d at 1151-52 (comparing the "usual course of business" of the employer against the business of its workers).

---

[17] Indeed, this "requirement" was apparently so perfunctory that Mr. Hogan was, as a matter of fact, paid by InStore for two projects he never completed.

[18] Mr. Hogan suggests that the vendor associates were tracked by secret shoppers during audits, but he provides no evidence of such practices or of any link to InStore (as distinguished from InStore's clients).  As a result, his suggestion plays no evidentiary role in evaluating the summary judgment record.

The first inquiry is not genuinely at issue here, because it is undisputed that Mr. Hogan provides retail services to InStore.  Rather, InStore argues that Mr. Hogan's provision of retail services is distinct and incidental to InStore's usual course of business, which it claims is the *coordination* of retail services.  Since InStore nominally disputes Mr. Hogan's characterization of its usual course of business, I must determine the reality of InStore's "actual business operations," not just its "own definition of its business."  *Sebago*, 28 N.E. 3d at 1152; *id* at 1150 (noting that, although defendants "advertise[d] themselves as providing taxicab services," this fact "d[id] not override the realities of the radio associations' actual business operations").  I turn now to my specific determinations concerning record evidence of whether Mr. Hogan's services were necessary as opposed to incidental to InStore's business.

Overall, I observe it is a matter of law whether the services performed by Mr. Hogan were in the usual course of InStore's retail merchandising business.  *See Awuah* v. *Coverall N. Am., Inc.*, 707 F. Supp. 2d 80, 82 (D. Mass. 2010); *Martins* v. *3PD, Inc.*, No. 11-cv-11313-DPW, 2013 WL 1320454, at *1 (D. Mass. Mar. 28, 2013).

a.  *InStore's Course of Business*

The Supreme Judicial Court has recognized that "a purported employer's own definition of its business is indicative of the usual course of that business." *Sebago*, 28 N.E.3d at 1150.  That being said, the Supreme Judicial Court has also been clear that "employers may not circumvent the Wage Act or other laws affecting employee compensation by creating illusory distinctions in the services they provide."  *Id.* at 1155.

Mr. Hogan argues that InStore's business is — as is his work — in retail services.  InStore contends that it does not actually perform retail services, but rather, "connects retailers and manufacturers seeking vendor associate services with independent contractor vendor associates seeking to perform such services."

At the same time, InStore holds itself out to the public as an "On-Demand," "nationwide full-service retail merchandising organization[]."  InStore states that it achieves its "retail merchandising mission . . . [by] deploy[ing] [its] retail associates in stores across America, to execute merchandising initiatives that grow our customers' sales, profits, and independent market share."  Indeed, InStore promises to "match the right individual to every customer retail assignment."  And during six years of submitting its annual corporate filing with the North Carolina Secretary of State's Office, InStore

46

described its business as "retail services." *See Carey*, 94
N.E.3d at 425 (noting the putative employer's annual corporate
filing as a factor in determining the defendant's course of
business).

Independent of its public marketing and regulatory
reporting, InStore has acknowledged in discovery in this case
that it is a retail services company. Its Chief Executive
Officer, Mr. Palombo, testified that InStore's business was
"retail services." Similarly, InStore contends in its papers
that it "contracts with retailers . . . and manufacturers . . .
to provide labor for certain retail services." In short, retail
services, "both internally and publicly, appear to form the
foundation of its business." *3PD*, 2013 WL 1320454, at *14.

Moreover, inspection of InStore's "actual business
operations" reinforces those descriptions. *Sebago*, 28 N.E. 3d
at 1152. InStore bids on projects advertised by retailers and
manufacturers; once they are selected, InStore contracts with
clients to provide labor for the project; and InStore then
advertises the client's project details, pay, location, and time
parameters on Natural Insight. InStore also contracts with
vendor associates who select as many, and which, assignments as
they choose among the listed projects. When vendor associates
complete projects, they are paid by the client through InStore.
Notably, InStore generates revenue from vendor associates.

47

InStore makes money when vendor associates complete projects and, if a vendor associate fails to perform a job for InStore's client, InStore "lose[s] the money," according to its Chief Executive Officer, Mr. Palombo.

Nevertheless, InStore insists that its usual course of business consists merely of "facilitating the connection between retailers or manufacturers and contract vendor associates," and is distinct from Mr. Hogan's actual provision of retail services.  Specifically, InStore argues that Mr. Hogan's services were outside the scope of its usual business because InStore has no employees who perform merchandising services.  In other words, because InStore does not treat any of its vendor associates as employees, it declares that its vendor associates are not, in fact, employees.  However, InStore cannot rely on this circular reasoning to argue "that it did not provide [retail] services because those services were provided by third parties when the question at issue is whether those third parties were employees of [InStore]."  *3PD*, 2013 WL 1320454, at *15.  Moreover, the question is not whether InStore has employees performing Mr. Hogan's role, but rather the question is, if InStore were to hire employees, would its employees "perform the same services as those whom the Agreement terms as 'independent contractors.'"  *Rainbow Dev., LLC*, 2005 WL 3543770, at *3.  Undoubtedly, the answer is yes.

48

Increasingly in the gig economy, the coordination and the provision of services are two sides of the same coin.  So it is here.  *Cf. Cunningham* v. *Lyft, Inc.*, No. 1:19-cv-11974-IT, 2020 WL 2616302, at *10 (D. Mass. May 22, 2020) (finding that "[t]he 'realities' of Lyft's [carpool] business are no more merely 'connecting' riders and drivers than a grocery store's business is merely connecting shoppers and food producers, or a car repair shop's business is merely connecting car owners and mechanics"), *appeal filed on other grounds*, No. 20-1567 (1st Cir. June 17, 2020) (interlocutory appeal pursued whether rideshare drivers are a "class of workers engaged in foreign or interstate commerce" exempt from the Federal Arbitration Act, 9 U.S.C. § 1, and whether the district court had jurisdiction over the motion to compel arbitration); *Mass. Delivery Ass'n* v. *Coakley*, 769 F.3d 11, 21 n.4 (1st Cir. 2014) (rejecting the argument that couriers were independent contractors working outside the course of the putative employer's business simply because "one performs the deliveries and the other arranges the deliveries").  The Supreme Judicial Court has resoundingly rejected the "false dichotomy between the administrative and operational aspects of their business." *Sebago*, 28 N.E.3d at 1148.  I conclude as a matter of law that the reality of InStore's business model is providing retail services.

   *b.* *Whether Mr. Hogan's Services Were Incidental or*
     *Necessary*

   The second factor in the usual course of business inquiry
is "whether the service the individual is performing is
necessary to the business of the employing unit or merely
incidental." *Sebago*, 28 N.E.3d at 1150 (quoting Att'y Gen.
Advisory).  A service is necessary to the purported employer's
business if it is "an essential part of the employer's
business." *3PD*, 2013 WL 1320454, at *13 (quoting Att'y Gen.
Advisory).

   The Supreme Judicial Court has given the following examples
of services performed within the usual course of an employer's
business:

> [A]rt instructor services performed on a "regular or
> continuous" basis within an art museum, musicians
> performing as a "usual and customary" activity at a "beer
> bar," and an organist playing music as a "usual part of"
> a funeral home's business.

*Carey*, 94 N.E.3d at 426 (quoting *Athol Daily News*, 786 N.E.2d at
372).  Although "essential" requires a direct connection to the
putative employer's core business, "a service need not be the
sole, principal, or core product that a business offers its
customers, or inherently essential to the economic survival of
that type of business," to be within the usual course of that
business.  *Id.* at 426.

The Supreme Judicial Court has further developed the definition of necessary and incidental through its analysis of two contrasting Illinois cases: *Parks Cab Co.* v. *Annunzio*, 107 N.E.2d 853 (Ill. 1952) and *O'Hare-Midway Limousine Serv., Inc.* v. *Baker*, 596 N.E.2d 795 (Ill. App. Ct. 1992). *See generally Sebago*, 28 N.E.3d at 1150-51.

In *Parks Cab Co.*, the putative employer owned no cabs and leased its taxicab medallions to its drivers for a flat fee on a weekly basis. *Parks Cab Co.*, 107 N.E.2d at 853-54. The putative employer was "not concerned" with the drivers' endeavors because "[i]ts business [was] the leasing of taxicab licenses, and in that business the drivers render[ed] no services for it." *Id.* at 855.

By contrast, in *O'Hare-Midway Limousine Serv., Inc.*, the drivers leased limousines from the putative employer and transported customers for fares; the drivers were required to remit a percentage (sixty percent) of the fares back to the limousine company. 596 N.E. 2d at 797. The putative employer was held to have "establish[ed] a financial interdependence" with the limousine drivers, because the drivers "picked up customers who had 'booked' limousine services" with the owner, and the owner received "a percentage of their commissions." *Id.* at 797.

From its analysis of *Parks Cab Co.* and *O'Hare-Midway Limousine Serv., Inc.*, the SJC observed that the definition of a necessary service turns on whether the purported employer's business is dependent on the *success* of the service provided by the "employee." *Sebago*, 27 N.E. 3d at 1151.

InStore's vendor associates are more like the limousine drivers in *O'Hare-Midway* than like the taxi drivers in *Parks Cab Co.* InStore actively solicits retailers and manufacturers for its vendor associates to provide retail services. InStore deals directly with clients, drawing up and negotiating contracts before any involvement from vendor associates. Retailers and manufacturers wishing to obtain retail services work directly with InStore, which lists client projects on Natural Insight and recruits vendor associates to perform such projects via email. Like the limousine service in *O'Hare-Midway*, InStore books client jobs for its vendor associates.

Second, unlike the taxi drivers in *Parks Cab Co.*, the vendor associates pay no flat fee to InStore, but rather are paid by InStore for each project. InStore is paid in turn by the client and takes a commission from the project. In no case does the client pay the vendor associate directly. Clients may provide specific instructions relating to performance and complaints about performance directly to InStore, but it is InStore that conveys this information to the vendor associates.

In short, InStore is not a wholesaler that takes little interest in whether and how its vendor associates perform. InStore deals directly with potential clients in selling the very retail services that vendor associates provide; it deals directly with clients in writing Worksheets and project descriptions; it deals directly with clients in mediating complaints regarding non-compliance with client conduct requirements and performance complaints; and it deals directly with clients in accepting payments, which it conveys to the vendor associates less its commission.

InStore's citation to a pair of cases governed directly by Massachusetts law, *American Zurich Insurance Co.* v. *Department of Industrial Accidents*, No. 05-3469, 2006 WL 2205085 (Mass. Super. Ct. June 1, 2006) and *Ruggiero,* is unavailing.

*American Zurich* is factually inapposite.  The Massachusetts Superior Court Judge there refused to disturb a decision of the Department of Industrial Accidents (DIA) that fifteen artisan workers were not part of a licensed home improvement contractor's usual course of business.  The case is thus procedurally different.

Additionally, it bears emphasizing that the Superior Court was confined to the administrative record and bound to a deferential standard of review: whether the DIA's determination was "unsupported by substantial evidence," or was "arbitrary or

capricious, an abuse of discretion, or otherwise not in accordance with the law." *Am. Zurich*, 2006 WL 2205085, at *2 (quoting Mass. Gen. Laws ch. 30A, § 14(7)).  Notably, this deference was applicable to the weight given to the putative employer's testimony, which the DIA Trial Examiner had found credible.  *Id.* at 3.  That alone is sufficient to distinguish the case at hand.

Moreover, several workers in *American Zurich* specifically asserted to the court that they were independent contractors, *id.* at *5, which dramatically contrasts with this case where Mr. Hogan, for himself and on behalf of other vendor associates, expressly seeks the protection of employee classification. Finally, *American Zurich* specifically distinguished cases where "a worker whose services form a regular and continuing part of the employer's business" and who lack "an independent business" for channeling the benefits of employment.  *Id.* at *4.  That is the case now before me, which arises in the summary judgment context where I do not weigh credibility or defer to other agencies charged with doing so.

In *Ruggiero*, I considered whether an insurance agent who sold insurance and annuity products for two insurance agencies had been improperly classified as an independent contractor. *Ruggiero*, 137 F.Supp. 3d at 107. There, I found that the putative employers were "not in the business of selling

insurance products directly; [they were] in the business of determining which products to make available, structuring and drafting the policies, obtaining regulatory approval for these policies, and investing the policy premiums." *Id*. at 118 (original emphasis omitted).

In *Ruggiero*, I identified two categories of Massachusetts cases challenging a worker's classification:

> [T]here are cases in which the defendants equip the plaintiffs with the tools, resources, and opportunity to sell or provide the defendants' products, often earning a commission or percentage of the sales, and essentially franchising their business; and . . . there are cases in which the defendants merely give the plaintiffs a license or a product and leave the plaintiffs to their own devices to make a profit from it.

*Ruggiero*, 137 F. Supp. 3d at 119.  The latter category is typified by cases where the employer's "business is not directly dependent on the success of the [workers'] endeavors."  *Id.* at 120 (quoting *Sebago*, 28 N.E.3d at 1151).  I found that the insurance agent in *Ruggiero* fell into the latter category because, as relevant here, the putative employer "could still produce insurance products without [sales] agents."  *Id.* at 119. In contrast, this case is akin to the franchising characterized by the former category.

As a threshold matter, I note InStore does not argue that it could continue as a company without vendor associates.

55

Second, InStore does not leave vendor associates "to their own devices to make a profit" from InStore's services, *Ruggiero*, 137 F. Supp. 3d at 119; rather, InStore was involved in directly selling retail services through its internal sales division. *Ruggiero* dealt with "business arrangements where the manufacturer does not engage in direct sales but instead empowers individuals to engage in their own, separate businesses that involve – but do not consist exclusively of – the sale of the manufacturer's products." *Id.*

Third, InStore was continually engaged at every stage of the relationship between vendor associate and client.  InStore published and hosted client projects on Natural Insight; it sometimes recruited vendor associates by email for certain projects; it provided vendor associates unique Worksheets per project; it sometimes shipped tools or supplies to vendor associates in preparation of client projects, and it paid for shipping; it authored a general conduct and dress code Policy for vendor associates and received inquiries from vendor associates about the Policy; it addressed complaints from vendor associates about client delays; and it distributed payments to vendor associates after verifying completion of projects.

InStore also mediated client complaints about vendor associates' noncompliance with the Policy and about vendor associates failing to perform their assignments; it wrote

56

Worksheets in conjunction with clients; and it accepted payments from clients following vendor associates' completion of projects. *Cf. Sebago*, 28 N.E.3d at 1149 (taxicab drivers provided services to radio associations where vouchers from associations' corporate clients were submitted to drivers as payment, and associations gave drivers amount equal to fare and tip minus a "'processing' fee"). The record before me establishes that InStore followed an internal "policy" to pay vendor associates more if a project went longer than the estimated number of hours and InStore had determined that the client, not the vendor associate, was at fault for a delay in completion. In short, at every stage of the process, InStore mediated work supplied from its retail associates to its clients.

Fourth, as discussed, InStore generates revenue as a result of successful completion of projects by its vendor associates. InStore cannot claim to outsource the very core of its business offering. *See, e.g.*, *Rainbow Dev.*, 2005 WL 3543770, at *3 (individuals who provide detailing and conditioning services for cars were engaged in the same business as employer that administered and coordinated these services); *3PD*, 2013 WL 1320454, at *15 (rejecting an employer's "attempt to separat[e] . . . executive and managerial functions . . . [as] insufficient

to take the service provided by workers outside the course of a business" (internal quotation marks omitted)).

InStore complains that interpreting the Massachusetts independent contractor statute to extend coverage to Mr. Hogan is a "result [that] defies logic." Such a holding would allow Mr. Hogan to be an employee of InStore and simultaneously an employee of an InStore competitor such that Mr. Hogan was an employee of multiple employers while performing projects at the same retail site. But InStore essentially asks me to mold the Massachusetts wage statute to fit its preferences for the retail services industry. Whatever the wisdom of the Massachusetts statute, the text is clear, and it makes no exception for employers simply because they are participants in the conventional gig economy.

Mr. Hogan and the other vendor associates were engaged in the "exact business [the employer] engaged in; [the employer] merely provides administration. Without services of the workers, [the employer] would cease to operate." *3PD,* 2013 WL 1320454, at *14 (alterations in original) (quoting *Rainbow Dev., LLC*, 2005 WL 3543770, at *3). I find as a matter of law that Mr. Hogan was providing services in InStore's usual course of business: retail services.

### 3.   Prong Three: Customary Engagement in an Independently Established Trade

While my finding on the second prong is sufficient to dispose of the summary judgment issues presented by the parties' cross-motions, for completeness I briefly address the third prong.

The Massachusetts employee definition statute requires the defendant to prove that the "the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." Mass. Gen. Laws ch. 149, § 148B(a).   As the Supreme Judicial Court has stated, the question under the third prong is whether "the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services." *Sebago*, 28 N.E.2d at 1153 (quoting *Athol Daily News*, 786 N.E.2d at 373).

In this case, Mr. Hogan had the right to contract with other companies like InStore to engage in merchandising services.  It is undisputed that Mr. Hogan could work for other merchandising companies.[19]  Thus, he did not depend on InStore

---

[19] I note that on January 6, 2017, the same day he filed the Original Complaint in this litigation, Mr. Hogan filed a separate lawsuit in this court against a different company, SPAR

for all his jobs, nor did he have to; the nature of the business was to pick and choose projects that he wanted to do on his own schedule.  Accordingly, as to this prong, I find as a matter of law that InStore has met its burden.

*    *    *    *    *

Since I have found, as a matter of law, that InStore cannot establish that Mr. Hogan, or any vendor associate, performed services outside of InStore's course of business, I find that Mr. Hogan and all InStore's vendor associates are appropriately classified as employees.  Accordingly, I will grant summary judgment for Mr. Hogan as to the classification issue under Mass. Gen. Laws chs. 149 and 151 and conversely deny summary judgment to InStore.

### V. CLASS CERTIFICATION

On the now operative pleading, the First Amended Complaint, Mr. Hogan moves as he did in his Original Complaint, to certify a class of "all individuals who have worked as 'vendors' or 'vendor associates' for InStore Group, LLC in Massachusetts

---

Group, Inc., alleging violations of the Massachusetts independent contractor statute stemming from hiring him as a "merchandiser" "in or about May 2015."  Complaint ¶ 40, *Hogan* v. *SPAR Grp., Inc.*, No. 1:17-cv-10024-LTS, 2017 WL 11219176 (D. Mass. filed Jan. 6, 2017).  Judge Sorokin granted final approval of a class action settlement in that matter for $250,000.  *Id.*, slip op. at 3 (D. Mass. Oct. 15, 2019).

since January 6, 2014," as to all counts.  InStore opposes class
certification.

## A.   *Standard of Review*

Federal Rule of Civil Procedure 23(a) allows class
certification when (1) the class is so numerous that joinder of
all members is impractical; (2) there are questions of law or
fact common to the class; (3) the claims or defenses of the
representative parties are typical of the class; and (4) the
representative parties will fairly and adequately protect the
interests of the class.  Fed. R. Civ. P. 23(a).  In addition,
plaintiffs must establish one of the three requirements in Fed.
R. Civ. P. 23(b).

Mr. Hogan proceeds under Rule 23(b)(3), which requires that
common questions of law or fact "predominate over any questions
affecting only individual members," and that "a class action is
[a] superior . . . method[]" of adjudicating the case. Fed. R.
Civ. P. 23(b)(3).  Relevant considerations under Rule 23(b)(3)
include:

> (A) the class members' interests in individually
> controlling the prosecution or defense of separate
> actions; (B) the extent and nature of any litigation
> concerning the controversy already begun by or against
> class members; (C) the desirability or undesirability of
> concentrating the litigation of the claims in the
> particular forum; and (D) the likely difficulties in
> managing a class action.

Fed. R. Civ. P. 23(b)(3).

Mr. Hogan has the initial burden of showing that his proposed class satisfies Rule 23's requirements.  *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015). If the parties dispute factual premises at this stage, I may "probe behind the pleadings," *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2007) (quoting *Gen. Tel. Co. of Sw.* v. *Falcon*, 457 U.S. 147, 160 (1982)), to "'formulate some prediction as to how specific issues will play out' in order to assess whether the proposed class meets the legal requirements for certification," *id.* (quoting *Waste Mgmt. Holdings, Inc.* v. *Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)).  District courts have "broad discretion when determining issues of class certification," *Grace* v. *Perception Tech. Corp.*, 128 F.R.D. 165, 167 (D. Mass. 1989), but must conduct "a rigorous analysis of the prerequisites established by Rule 23," *Smilow* v. *Sw. Bell Mobile Sys.*, Inc., 323 F.3d 32, 38 (1st Cir. 2003).

Massachusetts wage and hour laws are contemplated as giving rise to class claims under Mass. Gen. Laws chs. 149 and 151. *See* Mass. Gen. Laws ch. 149 § 150 (workers pursuing misclassification claims may do so for "others similarly situated"); *id.* ch. 151 § 20 (same).  And this right to pursue class-wide relief for violations of the Massachusetts Wage Act

Law and Independent Contractor Law is further protected by the statutory preclusion of waiver of these rights: "No person shall by a special contract with an employee or by any other means exempt himself from" Section 150.  *Id.* ch. 149 § 148.

**B.   *Analysis***

> 1.   Fed. R. Civ. P. 23(a)

> > a.   *Numerosity*

Rule 23(a)(1) requires a finding that "the class is so numerous that joinder of all members is impracticable."  InStore has, so far, identified over 200 vendor associates during the applicable time period; this sufficiently renders joinder impracticable.  *See Overka* v. *Am. Airlines, Inc.*, 265 F.R.D. 14, 18 (D. Mass. 2010) (district court may "draw reasonable inferences . . . to find the requisite numerosity" (quoting *McCuin* v. *Sec'y of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987)).  InStore does not contest numerosity.  I find that Mr. Hogan has satisfied the requirements of Rule 23(a)(1).

> > b.   *Commonality*

Rule 23(a)(2) requires a finding that "there are questions of law or fact common to the class."  The thrust of the inquiry is not "the raising of common 'questions' . . . but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011) (quoting

Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  In other words, the class claims must depend upon the resolution of "an issue that is central to the validity of each one of the claims in one stroke." *Id.*  Commonality is generally satisfied where class claims arise out of a uniform company policy or practice.  *See Garcia* v. *E.J. Amusements of N.H., Inc.*, 98 F. Supp. 3d 277, 286 (D. Mass. 2015) ("Wage claims involving system-wide practices or policies are appropriate for class treatment because establishing liability for one employee necessarily establishes liability for the entire class.").

That the second prong of § 148B(a) presents common questions of law and fact has been found beyond dispute in this action as a matter of law.  This prong asks whether retail services were in the usual course of InStore's business.  The parties agree that vendor associates performed retail services.  The putative class is composed of "all individuals who have worked as 'vendors' or 'vendor associates' for InStore."  Accordingly, there are common issues of law and fact, and evidence common to the class, for the second prong of the § 148B(a) test.

InStore contends that there are too many individualized questions regarding "directions and orders from the retailer or manufacturer," and whether vendor associates were "subject to

on-site supervision by InStore clients."  However, Mr. Hogan does not purport to rely on the involvement of InStore clients in decision making; rather, Plaintiffs rely on InStore's own actions, involving client observations, in exerting control over vendor associates' methods and means of performance – such as the ISG Worksheet, the general Policy, and the survey and photograph requirements for demonstrating completion of jobs. Even if liability were not established by the second prong of § 148B(a), Mr. Hogan would be permitted to develop the differences in damages discovery.

There is also a sufficient showing of commonality deriving from the first prong of § 148B(a).  The undisputed facts show that InStore relied on the same vendor associate Agreement and applied the same general Policy to its vendor associates.  These documents are precisely the kind of "general polic[ies]" contemplated by the Supreme Court in *Wal–Mart* that lend a case to class litigation treatment.  564 U.S. at 353 (quoting *Gen. Telephone Co. of Sw.* v. *Falcon*, 457 U.S. 147, 159 n.15 (1982)). This is sufficient to justify proceeding to damages discovery under class treatment.

InStore argues that Plaintiffs will have to evaluate each individual service that the putative plaintiffs performed, and whether that specific performance was necessary or incidental to InStore's usual course of business.  As discussed above, I

reject InStore's attempt to manufacture a genuine dispute of material fact over the distinction between retail services and retail merchandising services.  They are, as InStore concedes, "interchangeable" industry terms.  Moreover, I have already found that, as a matter of law, vendor associates performed services within InStore's usual course of business.

Mr. Hogan has therefore satisfied his burden of showing that Count I (the employee classification wage payment claim) of the First Amended Complaint relies on common evidence.  Count II (the minimum wage claim) is dependent on Count I.  Determination of the employment status of vendor associates will "resolve [the] issue that is central to the validity" of Count II "in one stroke." *Wal-Mart*, 564 U.S. at 350.  Although there may be some individual issues regarding the amounts of damages, these are not questions that trouble a determination of commonality. *Natchitoches Parish Hosp. Serv. Dist.* v. *Tyco Int'l, Ltd.*, 247 F.R.D. 253, 264 (D. Mass. 2008) ("[C]ommonality[] does not require 'that all putative class members share identical claims.'" (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531–32 (3d Cir. 2004)).

> c.  *Typicality*

The third prong of Rule 23(a) requires that the named plaintiffs' claims or defenses be "typical of the claims or defenses of the class."  The Supreme Court has explained that

"[a] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 625-26 (1997) (quoting *East Tex. Motor Freight Sys., Inc.* v. *Rodriguez*, 431 U.S. 395, 403 (1977)).  However, "perfect symmetry of interest is not required." *Matamoros* v. *Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012).  Rather, it is enough if "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 69 (D. Mass. 2005) (quoting *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 686 (S.D. Fla. 2004)).

InStore contends that Plaintiffs are not typical of the class because Mr. Hogan "specialized in demonstrations of goods," which accounts for only a small portion of InStore's business in Massachusetts.  Even indulgint the questionable assertion that Mr. Hogan could have developed a specialization as a result of the fewer than nine projects that he performed, I find Mr. Hogan typical of the class.

> d.    *Adequacy*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." To satisfy this inquiry, Mr. Hogan must show (1) that his

"interests . . . will not conflict with the interests of any of
the class members," and (2) that his "counsel . . . is
qualified, experienced and able to vigorously conduct the
proposed litigation." *Andrews* v. *Bechtel Power Corp.*, 780 F.2d
124, 130 (1st Cir. 1985).  "Only conflicts that are fundamental
to the suit and that go to the heart of the litigation prevent a
plaintiff from meeting the Rule 23(a)(4) adequacy requirement."
*Matamoros*, 699 F.3d at 138 (quoting 1 WILLIAM B. RUBENSTEIN, NEWBERG
CLASS ACTIONS § 3:58 (5th ed. 2012)).  In fact, the demonstration
of inadequacy of proposed named plaintiffs is quite demanding,
because "to forestall class certification the intra-class
conflict must be so substantial as to overbalance the common
interests of the class members as a whole." *Id*.  There is no
such intra-class conflict here.

InStore suggests that Mr. Hogan is not an adequate class
representative because he failed to file a complaint with the
Attorney General before bringing this action.  I have already
explained in Part IV.B.1. *supra* why I will allow the case to go
forward despite the deficiency.  InStore's concern is not enough
to defeat certification.  Moreover, Mr. Hogan's counsel has been
deemed adequate in previous cases in this Court, and, although
confronted with a degree of sloppiness in submissions by his
counsel in this case, I do not view those specific instances of
substandard performance to evidence disablingly inadequate

performance in this context.  I find that the named Plaintiff(s)
can adequately represent the class.

### 2.    Fed. R. Civ. P. 23(b): Predominance and Superiority

Rule 23(b)(3) permits class treatment where common
questions of law "predominate" over individual questions, and "a
class action is [a] superior . . . method" of adjudicating the
case. It requires "merely that common issues predominate, not
that all issues be common to the class." *Smilow*, 323 F.3d at 39.
In particular, "courts generally find the predominance
requirement to be satisfied even if individual damages issues
remain." *Id*. at 40. This inquiry turns on considerations of
efficiency in judicial administration.  *See Otte ex rel. Estate
of Reynolds* v. *Life Ins. Co. of N. Am*., 275 F.R.D. 50, 58 (D.
Mass. 2011).

I disagree with InStore's assessment that there is a
unacceptable risk of mini-trials as to each class member.  The
central issue of classification as a statutory employee —
irrespective of correlative attributes of an independent
contractor — predominates.  Ultimately, the plaintiff class must
show (1) that, during their terms as vendor associates with
InStore, they were entitled to protection as "individuals" under
the Wage Act; (2) that InStore cannot establish all three prongs
of the Massachusetts Wage Statute, and thus that they were
misclassified as independent contractors, rather than as

employees; (3) that they did not receive their required minimum wages and benefits under ch. 151; and (4) that they suffered a measure of damages.

The showings under (1) through (3) rely on common evidence, which predominates over individualized issues identified by the Defendant.  In Part IV.C., *supra*, I have already found that Mr. Hogan has made that showing as a matter of law.  The showing under (4) will require a modest degree of individualized inquiry into each class member's deductions, but this fact "does not alone defeat predominance." *DaSilva II*, 296 F.Supp. 3d at 406; *see also Garcia*, 98 F.Supp. 3d at 291 ("Calculating the precise amount of damages owed to each class member may also require some individualized inquiry.  But this task also does not stand in the way of class certification.").  Indeed, "[d]ue to the unique nature of employment classification claims, '[b]oth the United States Supreme Court and the Massachusetts Supreme Judicial Court have expressed a strong preference for rendering decisions on the classification of employees on [a] class wide basis." *3PD*, 2013 WL 1320454, at *9 (quoting *De Giovanni* v. *Jani-King Int'l, Inc.*, 262 F.R.D. 71, 85–86 (D. Mass. 2009)).

Given the common evidence and common issue of employment classification under InStore's policies, a class action is the superior method for adjudicating this case.  Accordingly, I will allow Mr. Hogan's motion for class certification.

## VI. CONCLUSION

For the reasons set forth in detail above,

I GRANT Mr. Hogan's Motion [Dkt. No. 24] for Leave to Amend his Original Complaint, and, on the First Amended Complaint, I GRANT his Motion [Dkt. No. 31] for partial summary judgment establishing statutory employee status;

I GRANT his Motion [Dkt. No. 29] for Class Certification; and

I DENY InStore's Motion [Dkt. No. 25] for Summary Judgment.

The parties shall submit on or before January 25, 2021 a status report with a proposed scheduling order designed to bring this case to final judgment.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE